UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
LISA MARIE CATER,

                                     **Civ. No.**

               Plaintiff,

     -against-                          **COMPLAINT**

THE STATE OF NEW YORK, THE EMPIRE
STATE DEVELOPMENT CORPORATION,       **(Jury Trial Demanded)**
GOVERNOR ANDREW CUOMO
(In His Individual Capacity),
and WILLIAM BALLARD HOYT a/k/a
SAMUEL B. HOYT, III (In His Individual Capacity),



                      Defendants.
-------------------------------------------------------------------X

     Plaintiff, LISA MARIE CATER ("Plaintiff" or "Cater"), by and through her

attorneys, DEREK SMITH LAW GROUP PLLC, complaining of Defendants, jointly

and severally, herein respectfully shows to this Court and alleges the following:

## NATURE OF THE CASE

     1.    This is an action in which the Plaintiff seeks relief for Defendants'

violation, under color of state law, of her rights, privileges and immunities secured by

the Civil Rights Act of 1871, 42 U.S.C. § 1983, the First, Fourth, Fifth and Fourteenth

Amendments to the United States Constitution, and the Constitution and laws of the

State of New York.

     2.    Plaintiff also complains to remedy violations of the laws of the State of

New York, based upon diversity and the supplemental jurisdiction of this Court

pursuant to Gibb, 38 U.S. 715 (1966) and 28 U.S.C. § 1367, seeking relief and

damages to redress the injuries Plaintiff has suffered as a result of being sexually

harassed, discriminated and retaliated against by her former employer on the basis of

gender discrimination, sexual harassment and retaliation inflicted upon Plaintiff by

Defendants.

3.    Defendant Hoyt engaged in a pattern and practice of committing sexual harassment, assault, discrimination and retaliation against Lisa Marie Cater thereby acting in coordination with the other Defendants to deprive the Plaintiff of her most fundamental constitutional liberties. Defendants failed to prevent unconstitutional acts against Plaintiff Cater.

4.    The Defendants had prior knowledge of these horrific acts by way of numerous protected complaints by Plaintiff Cater and through knowledge of past acts committed by Defendant Hoyt involving similar circumstances and unlawful acts.

5.    The Defendants willfully ignored any and all protected complaints by Plaintiff Cater and deprived the Plaintiff of her rights as granted to her by the United States Constitution.

6.    Upon information and belief, Defendant Governor Andrew Cuomo had direct knowledge of some or all of the discriminatory and unlawful events which transpired and failed to launch any investigation and/or prohibit the unlawful conduct which was well within his purview and authority.

## JURISDICTION AND VENUE

7.    Jurisdiction of this Court is proper under 42 U.S.C. § 2000e-5(f)(3), and 28 U.S.C. §§ 1331 and 1343 and the Civil Rights Act of 1866 and 1871 which give this Court jurisdiction for each statute; the damages; exclusive of interest and costs in this instance exceed that of all lower courts, and this Court's pendent jurisdiction is also invoked.

8.    Jurisdiction is also proper under 28 U.S. Code §1391 (b) since the action

may be brought in a judicial where any defendant resides, if all

Defendants are residents of the State where in the district is located.

Here, Defendant Cuomo has residence and a place of business located

within the Southern District of New York. The Empire Development

Corporation is also co-headquartered in the Southern District with a

Principal Place of Business located at 633 Third Avenue 37th Floor,

New York, New York 10017

9.     The unlawful employment practices alleged also herein occurred in part,

in the jurisdiction of the Southern District of New York.

## PARTIES

10.    Plaintiff Cater is an individual female who resides in the State of New

York, County of Eerie.

11.    Defendant, The State of New York (also referred to as "State"), is a

municipal corporation, incorporated in the State of New York, and resides in all

municipalities of New York. The causes of action in this case arise within the County

and City of New York, City of Buffalo, Eerie County, New York and the State

Capitol of Albany, Albany New York.

12.    Defendant, Governor Andrew Cuomo, is the head of the Executive

branch of the State of New York and serves as the State's Governor.

13.    The Office of the Governor of the State of New York has an office for

the purposes of conducting state business at 633, Third Avenue, 38th Floor, New

York, New York 10017 and has its Principal Place of Business at The NYS State

Capitol Building, Albany, NY 12224.

14.    Defendant Samuel HOYT III, was the head of and regional president of

New York State's Regional Economic Development Agency (Empire State

Development Corporation).

15.    The Empire State Development Corporation was created by the New York State Legislature and is an agency of New York State government, responsible in part for economic development. However, the Corporations regional office serve in a capacity akin to a local municipality.

16.    The Principal Place of Business for Empire State Development Corporation is located at 95 Perry Street, 5th floor, Buffalo, New York 14203 and also has a Principal Place of Business which is headquartered at 633 Third Avenue, 37th Floor, New York, New York 10017 .

17.    At all times material, the above mentioned entities conducted business throughout the Southern District of New York.

18.    At all times material the individual Defendants resided within the State of New York and conducted business throughout the jurisdiction of the Southern District of New York.

19.    At all times material, Defendant Hoyt served as an employee, agent and/or affiliate of the State of New York.

20.    At all times material, a sufficiently close nexus existed between the Defendant State of New York, Defendant Hoyt and Defendant Cuomo.

21.    At all times material, Defendant State of New York and/or Defendant Cuomo, delegated authority directly to Defendant Hoyt making him an arm of the State of New York.

22.    At all times material, Defendant Hoyt carried and possessed a New York State issued Blackberry cell phone in which Defendant Hoyt had direct access and communication to the Governor.

**PRELIMINARY STATEMENT**

23.    In or around middle of October, 2015, Plaintiff Cater was in search of a job with New York State.

24.    Plaintiff Cater had previously been the victim of domestic abuse and Defendant Hoyt used Plaintiff Cater's vulnerability to lure the Plaintiff in a predatory and unlawful game in which Defendant Hoyt sought to control every aspect of the Plaintiff's life, thereby causing the exacerbation, reactivation, and aggravation of Plaintiff's Post Traumatic Stress Disorder ("PTSD") along with other disabilities. Defendants' actions or lack thereof, caused the Plaintiff to fear for her life.

25.    Defendant Hoyt, a former assemblyman and officer of the Empire State Development Corporation, had the type of power that most politicians could only dream of. Defendant Hoyt had a direct line to the Governor, could call in almost any favors and most notably, was placed in charge of the State's nepotism. As Regional President, Hoyt possessed an incredible amount of power and wielded this power to hand out patronage jobs.

26.    Astonishingly, Defendant Governor Cuomo (founder of the Women's Equality Party) appointed Defendant Hoyt (a wolf dressed in sheep's clothing), to his powerful position of Senior Vice President for Regional Economic Development at the Empire State Development Corporation in 2011, even though he had full knowledge that in or around 2008, the New York State Assembly Ethics and Guidance Committee found that Defendant Hoyt was involved in a case of sexual misconduct as against female interns/employees.

27.    In Defendant Governor Cuomo's own words, as cited on the State's website "Sam Hoyt has dedicated his life to serving the people of New York," Governor Cuomo said. During his almost 20 years in the New York State Assembly,

Sam has proven to be a dedicated public servant who puts the needs of his constituents and community first. He has demonstrated the type of dedication and enthusiasm required for this new challenge." In other interviews, Defendant Cuomo further said **"[Defendant Hoyt] knows how Albany works."**

28.   For Defendant Hoyt, who knew "how Albany work[ed]", Plaintiff's application for a job, meant handing Plaintiff Cater a patronage job with the State, and further meant that Defendant Hoyt could seduce, manipulate, sexually harass and sexually assault the Plaintiff without any repercussions.

29.   Though married with children, Defendant Hoyt relentlessly pursued Plaintiff Cater, unlawfully and egregiously sexually assaulting and harassing the Plaintiff any chance he had. When Plaintiff Cater refused Hoyt's sexual advances, Hoyt became increasingly aggressive. Hoyt consistently and without remorse, engaged the Plaintiff in *quid pro quo* sexual harassment; threatening the Plaintiff's job and livelihood any chance he had.

30.   When Plaintiff Cater worked up enough courage to complain to the State of New York about the ongoing sexual harassment/assault at the hands of Hoyt, the evidence shows that the State of New York, it's agents and it's representatives, ignored and/or were deliberately indifferent toward the Plaintiff, making it seem as though she was the problem instead of the victim.

31.   As Plaintiff attempted to make protected complaints, the Plaintiff was met with hostility and in fact, one high ranking State Attorney went so far as to attempt to bribe the Plaintiff with money to keep quiet.

32.   As the sexual harassment and assault from Hoyt grew in severity, the Plaintiff suffered mental breakdowns and ultimately felt trapped. Fortunately, for Defendant Hoyt, he was able to take advantage of Plaintiff Cater's fragile state of

mind.

33.   In cinematic fashion, Defendant Hoyt offered to pay for Plaintiff Cater's mental treatment on account of the unlawful behavior which he knowingly, wantonly and egregiously perpetrated. However, there was a catch. Payment from Hoyt would come in the form of a settlement agreement which Defendant Hoyt coerced the Plaintiff to sign at her weakest point. With all of the bargaining power, money, intimidation and leverage; Defendant Hoyt forced the poor and destitute Plaintiff Cater to enter into a settlement agreement of $50,000. In exchange, Plaintiff Cater was to release Defendant Hoyt from any and all liability regarding his extreme, outrageous and unlawful behavior.

34.   While the Plaintiff's complaints went ignored, Defendant Hoyt and all Defendants named herein conspired to keep Plaintiff Cater quiet, or else she might face one of the numerous consequences that Hoyt so openly threatened the Plaintiff with. Alone, depressed and without any recourse, Plaintiff Cater decided to tell her story anyway and speak out against one of the most powerful men in the entire State of New York. On account of Plaintiff Cater's bravery which led her to come forward, Defendant Hoyt resigned from his position with the State. As is traditional, upon information and belief, the Governor also began to distance himself from Defendant Hoyt in the hopes of absolving himself of any and all liability.

35.   For Defendant Hoyt, absolute power corrupted him absolutely. However, for Defendant Hoyt, this was just politics as usual.

## FACTS

36.  In or around the middle of October, 2015, Plaintiff Cater emailed the Empire State Development Corporation, regarding assistance to the Plaintiff with affordable housing within New York State.

37. Surprisingly, Defendant Hoyt, Regional President of the Corporation, emailed
    Plaintiff Cater directly, met with the Plaintiff, and offered to find Plaintiff
    Cater a job in New York State.

38. Though it struck Plaintiff Cater as odd, that assistance would be offered so soon
    from the President himself, Plaintiff Cater emailed back and forth with
    Defendant Hoyt in the hopes of finding a job.

39. In a series of emails from Defendant Hoyt to Plaintiff Cater, Defendant Hoyt
    attempted to flirt with Plaintiff Cater and in doing so made it a point to advise
    the Plaintiff of his powerful position with the state and closeness to the
    Governor.

40. Defendant Hoyt advised Plaintiff Cater that he was in charge of patronage
    positions in New York State and that the Plaintiff should make no attempts to
    find another job, since Defendant Hoyt assured the Plaintiff he would secure
    her a job with the New York State Department of Motor Vehicles (DMV).

41. After Defendant Hoyt coerced Plaintiff Cater to tell him where she lived,
    Defendant Hoyt began stalking Plaintiff Cater. On one inappropriate occasion,
    in or around late November of 2015, Defendant Hoyt showed up unexpectedly
    at Plaintiff Cater's residence.

42. Upon arriving at Plaintiff Cater's residence, Defendant Hoyt rang the Plaintiff's
    doorbell, forcefully asserted himself against the Plaintiff, unlawfully groped
    the Plaintiff and then kissed the Plaintiff.

43. Defendant Hoyt's actions left the Plaintiff in a state of shock. Plaintiff Cater,
    fearful that Defendant Hoyt would strip Plaintiff Cater of any opportunity to
    work, at times, took on a go along to get along disposition, despite the fact that
    she protested Defendant Hoyt's actions.

44. At all times material, Defendant Hoyt aggressively and without any care for Plaintiff's protestations; texted, called and attempted to flirt with the Plaintiff.

45. In or around early January of 2016, Defendant Hoyt continued to barrage Plaintiff Cater with sexually harassing calls, texts and emails. Defendant Hoyt made it a priority to sexually harass Plaintiff Cater while he was in fact on vacation with his wife in Florida.

46. When Defendant Hoyt returned from his vacation (most of which was spent sexually harassing the Plaintiff), he stalked the Plaintiff on several occasions by showing up at the Plaintiff's residence.

47. On one such occasion, Defendant Hoyt forced Plaintiff Cater to let Defendant Hoyt into the Plaintiff's home. Upon entering the Plaintiff's home, Defendant Hoyt exclaimed his disdain and unhappiness over his marriage. After explaining this to the Plaintiff, without Plaintiff Cater's consent, Defendant Hoyt forced himself on the Plaintiff and kissed her.

48. In reaction to Defendant Hoyt's sexual assault and harassment, Plaintiff Cater told Defendant Hoyt unequivocally that the behavior was unwelcomed, unwanted and made her extremely uncomfortable. After making this protected complaint to Hoyt regarding the unwanted acts of sexual harassment, Hoyt finally let up and left the Plaintiff's home.

49. Plaintiff Cater's protestations against sexual harassment by Defendant Hoyt, only fueled the Defendant's unlawful desires and amplified his predatory behavior.

50. In or around this same time period, Defendant Hoyt was hosting his birthday party at the Park Meadow Restaurant. Though Plaintiff Cater was not in attendance, Defendant Hoyt texted the Plaintiff a number a times, further depicting Defendant Hoyt's unlawful desire to control the Plaintiff, despite the

fact that Defendant Hoyt was with his family at the time he was texting Plaintiff Cater. Texts of this nature were sent on a daily basis for weeks on end from at or around 8:00 A.M. up and until 10:00 P.M.

51. Defendant Hoyt dangled the job over Plaintiff Cater's head as he continued to harass her and promise Plaintiff Cater each time that he would secure her a job with the New York State DMV.

52. In or around early February of 2016, Denise O' Keefe, a representative of the DMV, informed Plaintiff Cater that she had been accepted for an employee position with the DMV. Plaintiff Cater was further informed she would be a Secretary I at the DMV and there would be no interview or application process. On or about February 11, 2016, Plaintiff Cater began working.

53. Upon information and belief, at this time and all times material, the Defendants never advised Plaintiff Cater of where to find an employee handbook and never advised the Plaintiff of how to make a complaint for sexual harassment.

54. Upon information and belief, O'Keefe informed Plaintiff Cater of the above because Plaintiff Cater was selected through a shady process known as the "Management Confidential" process. On it's face, Management Confidential seemed legitimate. However, upon information and belief, Management Confidential was used as a vehicle to grant political favors in the form of patronage jobs to friends of the Governor and his allies.

55. On account of calling in a political favor for Plaintiff Cater, Defendant Hoyt used his authority to once again make aggressive and unwanted sexual passes at Plaintiff Cater.

56. As a result of Defendant Hoyt's unlawful and unwelcomed behavior, the Plaintiff's mental health rapidly deteriorated.

57. As a further result of Defendant Hoyt's unlawful behavior, Plaintiff attempted to reach out for guidance, however, no one wanted to help Plaintiff Cater because most of the individuals that the Plaintiff contacted, advised the Plaintiff that they did business with Defendant Hoyt and did not wish to push their luck.

58. The situation worsened substantially. Defendant Hoyt's predatory behavior reached an unprecedented level. Defendant Hoyt called and texted Plaintiff Cater every single night. Each time that the Defendant texted (most of which elicited sexual acts and/or were of a sexually harassing nature), the Defendant made sure to engage in acts of *quid pro quo* by reminding the Plaintiff that he got the Plaintiff her job, which could just as easily be taken away with a single phone call if the Plaintiff refused to give into Defendant Hoyt's unlawful behavior.

59. Each day at work for the DMV and State of New York, Defendant Hoyt, who had the power as Regional President of the Empire State Development Corporation to hire, fire and supervise Plaintiff Cater, continued to sexually harass Plaintiff Cater.

60. Plaintiff Cater explained to Defendant Hoyt, again, that she was uncomfortable with Hoyt's sexually harassing behavior. Plaintiff Cater further complained that she was upset that Defendant Hoyt threatened to jeopardize her job if she refused his advances.

61. In or around late February of 2016, Defendant Hoyt, without consent, sent an offensive and unwanted text message to Plaintiff Cater. Defendant Hoyt sent Plaintiff Cater a nude photo of himself and asked the Plaintiff "Do you think I look tan?"

62. Plaintiff Cater began to shake uncontrollably after receiving this text, adding to her symptoms of depression and anxiety. Plaintiff was so visibly disturbed by Defendant Hoyt's behavior, that a co-worker became concerned and gleaned over at the Plaintiff and her phone. Plaintiff Cater's co-worker was stunned as well and could not believe Defendant Hoyt's unlawful and abhorrent behavior.

63. As winter became spring, Defendant Hoyt's sexually harassing behavior continued. Constant emails and texts from Defendant Hoyt, filled the Plaintiff's inbox. Notably, unwelcomed visits from Defendant Hoyt to Plaintiff Cater's residence continued as well.

64. Scared, helpless and knowing that her job (only source of income) was on the line, Plaintiff Cater endured Defendant Hoyt's behavior despite being on the brink of a nervous breakdown.

65. On one such unsolicited visit from Defendant Hoyt, the Defendant told Plaintiff Cater that he should get counseling in order to stop the behavior and pursuit of Plaintiff Cater. After exclaiming his instability and sexual prowess to the Plaintiff, the Plaintiff became scared for her life.

66. Each time that Plaintiff Cater protested Defendant Hoyt's behavior by stating explicitly that the conduct was unwelcomed, Defendant Hoyt would threaten the Plaintiff by aggressively telling her that she should "be grateful" for the job the Defendant got her and that "the job could go away at any time" the Defendant desired.

67. Defendant Hoyt would further threaten Plaintiff Cater by advising her of how close he was with the Governor of New York. This frightened Plaintiff Cater even more because upon information and belief, the Governor would always

be side by side with Defendant Hoyt anytime that the Governor visited

Defendant Hoyt's State region.

68. As a result of the abuse that Defendant Hoyt was leveling against the Plaintiff, the

Plaintiff adopted a cat from the homeless shelter to comfort her. However, her

comfort in having a cat was nothing more than a fleeting moment. When

Defendant Hoyt discovered that Plaintiff Cater had a cat, Defendant Hoyt used

the cat as a means to stalk the Plaintiff on a daily basis and ask her about the

cat; but not before engaging the Plaintiff in bouts of *quid pro quo* sexual

harassment.

69. On account of Defendant Hoyt's behavior, Plaintiff Cater's mental health

condition worsened. Plaintiff Cater encountered many restless nights and

panic attacks as she feared that Defendant Hoyt would terminate her job at any

moment, leaving Plaintiff Cater to be homeless on the streets.

70. In or around July of 2016, Defendant Hoyt demanded that Plaintiff Cater attend a

fireworks show with him. Defendant Hoyt pressured and threatened Plaintiff

Cater for days, literally making Plaintiff Cater sick and forcing Plaintiff Cater

to go to the hospital for stomach pains caused directly by Defendant Hoyt's

demands and threats.

71. Subsequently, Plaintiff Cater had a stroke of luck, as Defendant Hoyt informed

Plaintiff Cater she would no longer need to attend since Defendant Hoyt's

wife also now wanted to attend the fireworks show.

72. Even though Defendant Hoyt was the reason Plaintiff Cater was in the hospital,

Defendant Hoyt wasted no time calling an administrator at the hospital to track

the Plaintiff's whereabouts at the hospital and to make sure the Plaintiff was

seen immediately.

73.  Upon hearing of Defendant Hoyt's involvement at the hospital, it became
abundantly clear that Plaintiff Cater was in the Defendant's grip and that
Defendant Hoyt would stop it nothing to fulfill his unlawful sexual desires.

74.  Terrified by Defendant Hoyt's actions and realizing that all of Plaintiff Cater's
protected complaints to Hoyt fell on deaf ears, Plaintiff Cater called the
Governor's Office twice to file a protected complaint regarding the extreme
sexual harassment, as well as the severe and pervasive hostile environment
that Defendant Hoyt created for the Plaintiff both at work and at home.

75.  On Plaintiff's first attempt to complain to the Governor's Office, in or around
July 2016, Plaintiff Cater's complaints were ignored and the Plaintiff was
advised that she could not be directed to a source to help her. Plaintiff Cater
directly mentioned that Defendant Hoyt was making her uncomfortable at
work and asked for direction.

76.  On Plaintiff's second call to the Governor's Office, the office was deliberately
indifferent to the Plaintiff's protected complaints and instead told Plaintiff
Cater to "complain to the boss of the person sexually harassing" her. However,
Plaintiff Cater was perplexed by the Office's response, since Defendant
Hoyt's boss, as stated by Hoyt, was in fact the Governor himself, Defendant
Andrew Cuomo.

77.  Plaintiff Cater then took further steps to complain of the sexual harassment by
contacting the Governor by email which was listed on his government
webpage. Despite the gravity and seriousness of the Plaintiff's complaints, the
Plaintiff was ignored by the Governor and/or his office since they provided no
response and/or were deliberately indifferent to the protected complaint of the
Plaintiff against such a powerful statesman like Defendant Hoyt.

78. Feeling hopeless and knowing from previous experiences that complaining proved to be futile, Plaintiff Cater then attempted to complain about Defendant Hoyt's behavior on the Governor's Facebook page. As anticipated, the Governor and his office once again ignored Plaintiff Cater's serious complaints and cries for help, despite the fact that Plaintiff Cater complained numerous times on the social media platform, and despite the fact that upon information and belief, employees of Defendant State of New York and/or it's agents and affiliates monitored the page.

79. In a series of unfortunate events, Plaintiff Cater's cat attacked her, causing serious damage to her right hand.

80. In or around July, 2016, as a direct and proximate result of Defendant Hoyt's sexual harassment, as well as the nerve damage caused by the Plaintiff's cat, Plaintiff Cater's mental and physical health further deteriorated, forcing the Plaintiff to temporarily leave work on short-term disability.

81. Upon taking leave from work, Defendant Hoyt jumped on the opportunity to tighten his grip on the Plaintiff's life while simultaneously taking advantage of the Plaintiff's mental state.

82. In or around this same time period, in late July of 2016, Defendant Hoyt's unlawful predatory behavior, forced the Plaintiff to mentally hit rock bottom. In the midst of her breakdown, Plaintiff Cater knew with certainty that she must confront her abuser.

83. In or around August of 2016, Plaintiff Cater asked to see Defendant Hoyt. Defendant Hoyt agreed to see Plaintiff Cater but ordered her to meet him in a park. Scared to death but feeling as though there was no alternative, Plaintiff Cater complied with Defendant Hoyt's order.

84. Upon arriving at the park at or around 1:30 P.M., Plaintiff Cater explicitly told Defendant Hoyt "I don't care. I can't be abused by you anymore. I can't mentally handle this. Take my job, take my apartment, I don't care!"

85. **At that moment, in a predatory fit of rage, Defendant Hoyt forced himself on the Plaintiff, grabbing her so that she could not safely retreat. Defendant Hoyt then groped the Plaintiff's vagina and crotch area, squeezing as hard as he could and hurting the Plaintiff. Defendant Hoyt then said "You know this is what I want!"**

86. After unlawfully and maliciously sexually assaulting Plaintiff Cater, Plaintiff Cater began to cry. Defendant Hoyt's actions shocked the Plaintiff's conscience and left her devastated. Plaintiff asked herself: why would Defendant Hoyt, an extremely powerful political figure of New York State, use his authority as Regional President to physically abuse, sexually assault and sexually harass the Plaintiff.

87. Plaintiff Cater didn't know where to turn. However, the Plaintiff did advise representative of Met Life what occurred and why the sexual harassment/assaults had exacerbated, aggravated and accelerated her deteriorating state of mental health.

88. As a further result of Defendant Hoyt's conduct and all of Defendants' deliberate indifference and avoidance of the Plaintiff's complaints, the Plaintiff was forced to seek serious psychological help around this time period.

89. Plaintiff Cater further reached out to a confidential Victim's Advocate at the Erie County District Attorney's Office, as a way to help her mentally cope with the ongoing sexual harassment and hostile work environment.

90. In or around October, 2016, Defendant Hoyt continued to contact Plaintiff Cater, except this time, the purpose of contacting Plaintiff Cater was to force her to keep her mouth shut no matter what.

91. Plaintiff Cater explained how Defendant Hoyt had destroyed her mentally and how she would need mental counseling and maybe even an institution.

92. When Defendant Hoyt heard of how mentally destroyed Plaintiff Cater was, Defendant Hoyt then used his leverage, authority, bargaining power and manipulation to tell the Plaintiff, while she was mentally unstable, to enter into an agreement.

93. In the agreement, Hoyt promised Plaintiff Cater that she could use some of the money could be used towards her mental counseling for all of the unlawful acts that Defendant Hoyt put her through. Defendant Hoyt did this because he was well aware that Plaintiff Cater was financially strapped and wouldn't be able to afford the counseling she needed otherwise.

94. To make matters worse, Defendant Hoyt told Plaintiff Cater that even though he knew her emotional distress was caused by his unlawful actions, he would start a Go Fund Me Page (online fund raising mechanism) for the Plaintiff and would say that Plaintiff needed help because of the injury she sustained from her cat, even though nothing could be farther from the truth.

95. Moreover, Defendant Hoyt told Plaintiff Cater that he feared Plaintiff Cater taking her story public. Therefore, with full knowledge that Plaintiff Cater was in no state of mind to sign anything, Defendant Hoyt forced Plaintiff Cater to accept $50,000 in exchange for silence.

96. Plaintiff Cater told Defendant Hoyt that she could not afford an attorney, nor did she understand anything she was reading. Defendant Hoyt told her to sign it

anyway. Though Plaintiff Cater was not mentally fit to sign such an

agreement, Defendant Hoyt forced her to; or she would face the consequences

of losing her job for good and perhaps be blackballed from working anywhere

in the regional area and perhaps the entire State of New York.

97.  Plaintiff Cater worked up enough courage to once again tell Defendant Hoyt that

he needed to inform his boss (Governor Cuomo) of what took place.

98.  At or around this same time period, Plaintiff Cater again contacted the

Governor's Office to complain about sexual harassment.

99.  **Defendant Hoyt explicitly told Plaintiff Cater, that he had spoken with his**

**boss/Governor's Office and that Defendant Hoyt was told to "Make this**

**go away."** In other words, upon information and belief, Defendants wanted to

absolve themselves of any liability and further wanted to suppress Plaintiff

Cater's protected complaints of sexual assault, harassment, retaliation and

hostile work environment.

100.  Defendant Hoyt followed orders and "Made [Plaintiff Cater] go away," by

forcing her to enter an agreement he knew she could not enter.

101.  In or around this same time period, the Governor's Office sent out a generic

mailing to constituents via email, regarding issues on women's rights.

102.  Plaintiff Cater saw this as a glimmer of hope and an opportunity to reach out

to someone from the State of New York, again, in a desperate cry for help.

103.  Plaintiff Cater responded to the generic email by writing "If you care so much

about woman's issues, why do you allow [Defendant] Sam Hoyt to continue to

harass me both verbally and sexually?"

104.   Plaintiff's complaint on account of her protected status under Federal and State law, was read and received by Defendants' employee, Noreen Van Doran ("Van Doran").

105.   Upon information and belief, Van Doran was and is an attorney and employee for the Governor's Office.

106.   Upon information and belief, Defendants' employee Van Doran has the authority to investigate complaints, take tangible employment actions for the State as against employees, and has authority as vested in her by the Governor, to take any and all actions necessary to deal with protected complaints.

107.   Much to Plaintiff Cater's chagrin, Defendants' employee Noreen Van Doran delivered a response to the Plaintiff that was both appalling and unlawful in nature. Defendants' employee Noreen Van Doran asked the Plaintiff to call her to speak about the issue.

108.   Plaintiff Cater did as she was told. During Plaintiff Cater's conversation with Defendants' employee Van Doran, Plaintiff Cater explained (i) the sexual harassment perpetrated by Defendant Hoyt; (ii) that Plaintiff Cater had trouble working as a result of Defendant Hoyt's actions; (iii) Defendant Hoyt's threats to fire her if she spoke out about sexual harassment; (iv) her deteriorated mental state as a result of Defendant Hoyt's sexual assaults and harassment; and (v) the possibility of moving to a different position where Defendant Hoyt could not contact her.

109.   In what can only be described as a shocking response, Defendants' employee Van Doran attempted to unlawfully bribe Plaintiff Cater in exchange for remaining silent about Hoyt's actions.

110.   **Defendants' employee Van Doran stated point blank "What is it that you want, money?"**

111.   The above statement represents how Defendants' employee Van Doran attempted to unlawfully silence Plaintiff Cater by bribing her with money. It further demonstrates how the New York State Defendants, under the color of law, used their power to (i) ignore the Plaintiff's protected complaints; (ii) cover up for Defendant Hoyt, and (iii) unlawfully bribe Plaintiff Cater so that she would remain silent and forever be deprived of her Constitutional rights.

112.   Upon hearing this statement from Defendants' employee Van Doran, Plaintiff Cater hung up the phone and was left mentally distraught.

113.   Defendants' employee Van Doran attempted to contact Plaintiff Cater, but the Plaintiff was so shocked and appalled by Van Doran's statements, that she refused to pick up.

114.   Instead, Van Doran emailed the Plaintiff, apologized for her behavior and referred Plaintiff over to the Inspector General's Office; once again leaving Plaintiff Cater to fend for herself in the endless bureaucratic tape of the State of New York.

115.   Notably, Van Doran also advised the Plaintiff that the State was not equipped to handle such sexual harassment complaints since it was primarily "Grade Six (6)" employees that worked for some of the agencies that received Plaintiff Cater's Complaints.

116.   The above is just one of many examples where Defendants failed to properly train, supervise and investigate complaints of a protected status. This failure also depicts how the Defendants deprived the Plaintiff of her constitutional rights.

117.  Plaintiff Cater contacted the Inspector General's Office and after being
      mistreated by several employees who were dismissive and rude, Plaintiff Cater
      finally had the opportunity to speak with Defendants' employee Peter Smith,
      who informed the Plaintiff he could help. Smith agreed to set up an
      appointment for Plaintiff Cater with senior representatives of the New York
      State Joint Commission On Public Ethics ("JCOPE").

118.  According to the JCOPE website, "The Commission plays a significant role in
      the operation and oversight of government –promoting integrity by helping
      those in public service understand their ethical obligations, ensuring
      transparency through rigorous public reporting disclosures, and providing
      accountability through enforcement actions to address ethical misconduct.
      This website is a resource for state officers and officials, lobbyists and their
      clients, and the general public, providing information on the Commission's
      activities, as well as training and guidance for those subject to its jurisdiction."

119.  At or around this same time period, after speaking with Defendants' employee
      Smith and representatives of JCOPE, Plaintiff Cater received a phone call
      from Defendant Hoyt.

120.  Defendant Hoyt, through his political power and patronage, somehow found
      out about Plaintiff Cater's complaints to JCOPE.

121.  Defendant Hoyt then threatened Plaintiff Cater, telling her that JSCOPE would
      never help her because he was too powerful and was in contact with the
      Governor directly. Immediately after threatening Plaintiff Cater, Defendant
      Hoyt then stated that he would help Plaintiff Cater with her bills and would
      help the Plaintiff with her complaints personally.

122.   As a direct result of Defendant Hoyt's threats and as a result of the manner in which Defendant Hoyt found out about Plaintiff Cater's complaints, the Plaintiff was forced to cancel her JSCOPE appointment.

123.   In or around November of 2016, Plaintiff was receiving psychological counseling almost full time.

124.   At or around this same time period, the Plaintiff finally mustered the courage to meet with representatives of JSCOPE even in spite of Hoyt's threats because she was at a point where she did not care anymore what Defendant Hoyt could do to her.

125.   Upon information and belief, JSCOPE did not perform a full and fair investigation of Plaintiff Cater's complaints.

126.   As Plaintiff Cater's health continued to deteriorate, Defendant Hoyt grew in power and continued on as Defendant Cuomo's "right hand man" (as described by Hoyt) and as Regional President of one of the most powerful New York State Agencies.

127.   Upon information and belief, while the Governor would previously attend events with Defendant Hoyt, as of late, Defendant Governor Cuomo was nowhere to be seen, especially not next to Defendant Hoyt or his region in New York State.

128.   Nearing suicidal ideations and further mental deterioration as a result of Defendant Hoyt's torture, Plaintiff Cater spoke out (confidentially) to the media about her story.

129.   Immediately thereafter, Defendant Samuel Hoyt III resigned from his position with New York State.

130.   In an official statement

131.    The emotional distress that Defendants put Plaintiff Cater through, has left a
        devastating impact on her life and has prevented her from returning to work in
        the capacity she once had.

132.    The above also demonstrates that the Defendants failed to properly investigate
        Plaintiff Cater's complaints and as a result of the duration of time it took to
        investigate, Plaintiff Cater suffered further acts of discrimination, sexual
        harassment, retaliation, hostility and the overall deprivation of her
        constitutional rights.

133.    The above facts, which constitute violations of federal and state law, were a
        proximate and legal cause of the Plaintiff's injuries.

134.    Defendants failed to supervise, train and discipline employees, agents, servers,
        affiliates and/or other under its control with regard to constitutional rights,
        sexual harassment and discrimination.

135.    The above are just some examples of the many in which Defendants explicitly
        or implicitly, unlawfully discriminated against and deprived Plaintiff Cater of
        her Constitutional rights.

136.    Plaintiff Cater lives day to day on social security/disability and relives the
        nightmare that Defendants put her through each and every day.

137.    As a result of the Defendants unlawful behavior, the Plaintiff suffers and will
        continue to suffer severe emotional distress which has also caused physical
        ailments.

138.    As a further result of the Defendants unlawful behavior, Plaintiff Cater has
        suffered future pecuniary losses, suffering, inconvenience, loss of enjoyment
        of life, and other non-pecuniary losses.

139. As Defendants' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law, to the extent that the law permits, Plaintiff Cater demands Punitive Damages against the Defendants.

140. The above actions also represent an ongoing violation

## FIRST CAUSE OF ACTION
## VIOLATION OF RIGHTS SECURED BY 42 U.S.C. §1983
## (Against All Defendants)

141. Plaintiff incorporates all preceding paragraphs of this Complaint as if fully restated herein.

140. 42 U.S.C. § 1983 provides that:

Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . .

141. In committing the acts of sexual harassment, discrimination retaliation and all other illegal acts complained of herein, the Defendants acted jointly and under color of state law to deprive Plaintiff Cater of her clearly established constitutionally protected rights under the Fourteenth Amendment of the United States Constitution.

142. In failing to investigate Plaintiff Cater's numerous complaints and/or by ignoring, attempting to bribe, and/or concealing Plaintiff's protected complaints, the Defendants acted individual and/or jointly and under the color of state law to deprive Plaintiff Cater of her clearly established constitutionally protected rights as

afford by the Fourteenth Amendment of the United States

Constitution

143.   Plaintiff in this action is a citizen of the United States and all of

the individual Defendants to this claim are persons for purposes of

42 U.S.C. § 1983.

144.   An employee may bring a retaliation claim under §1983 against

a supervisor, state official, and/or their agent/affiliate in their

individual capacity to whom they delegated authority, who, acting

under color of law, retaliates and further discriminates against her

for opposing discrimination and other forms of illegal conduct in

the terms of her employment.

145.   Defendants violated the above statute through multiple acts of

unlawful gender discrimination, sexual harassment, retaliation the

creation of a severe and pervasive hostile work environment as

well as all other acts of unlawful behavior and misconduct

perpetrated against the Plaintiff.


**<u>SECOND CAUSE OF ACTION</u>**
**(Individual Supervisory Liability - 42 U.S.C. § 1983)**

146.    Plaintiff incorporates all preceding paragraphs of this

Complaint as if fully restated herein.

147.   Individual Defendant Hoyt, was at all relevant times, a

supervising official with the State of New York, with oversight

responsibility for the training, instruction and supervision of the

Plaintiff and other employees of the State of New York, hired

through the Management Confidential process.

148.   Individual Defendant Cuomo, was at all relevant times, a
supervising official with the State of New York, with oversight
responsibility for the training, instruction and supervision of the
Plaintiff and other employees similarly situated within the State of
New York.

149.   The above cited Defendants knew or should have known that
Defendant State of New York and Defendant Empire State
Development Corporation failed to intervene to prevent the clearly
discriminatory retaliatory and other unlawful actions taken against
Plaintiff.

150.   The above named Defendants as supervisory officers within
the State, failed to properly oversee other State employees that
were tasked with handling, reporting and investigating protected
complaints from the Plaintiff.

151.   Defendant Cuomo and his supervising employees also knew or
should have known that Defendant Hoyt was committing unlawful
acts against Plaintiff and failed to respond or address such actions
in any way. This knowledge and failure to act served only to strip
the Plaintiff of her basic fundamental constitutional liberties.

152.   Upon information and belief, Defendant Cuomo and/or
Defendant Hoyt were personally involved in either ordering,
and/or failing to take preventative and remedial measures to guard
against the unconstitutional discrimination, sexual harassment and
retaliation and hostile work environment against Plaintiff, which
deprived the Plaintiff of basic constitutional rights. Defendant

Cuomo and State employees with supervising authority under his power, knew, or in the exercise of due diligence, should have known, that the unconstitutional actions taken against Plaintiff by Defendant Hoyt were likely to occur, especially given (i) the nature of the Plaintiff's complaints to Defendant State of New York and (ii) Defendant Hoyt's actions of past misconduct while serving as a New York State Assemblyman.

153.   The failure of the individual supervisory Defendants to train, supervise and/or discipline State employees and Defendant Hoyt with respect to their unlawful discrimination and retaliatory actions amounted to gross negligence, deliberate indifference or intentional misconduct, which directly and proximately caused the injuries and damages to Plaintiff set forth herein.

154.   The failure of any individual supervisor, authority figure, or employee of the State of New York to properly advise Plaintiff Cater of how to file protected complaints prior and during her tenure as a State employee also amounts to gross negligence, deliberate indifference and/or intentional misconduct, which directly and proximately caused the injuries and damages to Plaintiff set forth herein.

**THIRD CAUSE OF ACTION**
**(EQUAL PROTECTIONS - 42 U.S.C. § 1983)**

155.   Plaintiff incorporates all preceding paragraphs of this Complaint as if fully restated herein.

156.   Individual Defendant Cuomo, was at all relevant times, the head

of New York State's Executive Branch, with oversight
responsibility for the training, instruction and supervision of the
Plaintiff and similarly situated employees.

157.   Defendant Cuomo, his agents and/or affiliates failed to
intervene to prevent the clearly discriminatory and retaliatory
actions taken against Plaintiff.

158.   Defendant Cuomo and/or his agents and affiliates actively
participated in the clearly discriminatory and retaliatory actions
taken against Plaintiff.

159.   Defendant Cuomo and/or his agents and affiliates explicitly
and/or implicitly condoned other New York State employees to
participate in the clearly discriminatory, retaliatory actions and
unlawful actions taken against Plaintiff

160.   Defendant Cuomo and/or his agents and affiliates, as
supervisory officers of the State of New York, failed to supervise
other employees of the State of New York, including Defendant
Hoyt, regarding unlawful discrimination and retaliation.

161.   Defendant Cuomo and/or his agents and affiliates also knew or
should have known that Defendant Hoyt was unlawfully
discriminating against Plaintiff and failed to respond or address
such actions in any way.

162.   Upon information and belief, Defendant Cuomo and/or his
agents and affiliates were personally involved in either ordering,
or failing to take preventative and remedial measures to guard
against the unconstitutional discrimination and retaliation against

Plaintiff.

163.   Defendant Cuomo and/or his agents and affiliates knew, or in the exercise of due diligence, should have known, that the unconstitutional actions taken against Plaintiff by Defendant Hoyt were likely to occur.

164.   The failure of the individual supervisory Defendants to train, supervise and/or discipline any of the aforementioned employees agents and/or affiliates with respect to their unlawful discrimination and retaliatory actions amounted to gross negligence, deliberate indifference or intentional misconduct, which directly and proximately caused the injuries and damages to Plaintiff set forth herein.

## FOURTH CAUSE OF ACTION
### (EQUAL PROTECTIONS - 42 U.S.C. § 1983)

165.   Plaintiff incorporates all preceding paragraphs of this Complaint as if fully restated herein.

166.   The aforementioned sexual harassment Plaintiff was forced to endure at the hands of Defendant Hoyt amounts to sexual harassment, sexual assault, gender discrimination, retaliation, the creation of a hostile work environment and the deprivation of Plaintiff's Constitutional rights. .

167.   Defendant Hoyt engaged in sexual misconduct and discrimination on countless occasions.

168.   The ensuing acts of sexual harassment and assault committed by Defendant Hoyt were based on the Plaintiff's gender, as a female

employee and males would not have been subjected to the same

treatment.

## FIFTH CAUSE OF ACTION
*(Monell* **Claim - 42 U.S.C. § 1983- Against Empire State Corporation/Region of Buffalo)**

169.    Plaintiff incorporates all preceding paragraphs of this

Complaint as if fully restated herein.

170.   All of the acts and omissions by the Defendants described

above, with regard to the unreasonable, unlawful, and retaliatory

discrimination, sexual harassment and deprivation of rights as

against Plaintiff were carried out pursuant to overlapping *de facto*

policies and practices of the State of New York's Empire

Corporation which were in existence at the time of the conduct

alleged herein and were engaged in with the full knowledge,

consent, and cooperation and under the supervisory authority of

Defendant Empire State Development Corporation, Defendant

State of New York and its agencies, as well as the Office of the

Governor.

171.   The Empire State Development Corporation's Western Region

was led by Defendant Hoyt and therefore covered the local

municipalities of that region.

172.   Defendant Empire State Development Corporation, by their

policy-making agents, servants and employees, authorized,

sanctioned and/or ratified the individual wrongful acts of

Defendant Hoyt, Defendant Cuomo, other actors of the regional

corporation   as cited in the above complaint, and/or failed to prevent or stop those acts; and/or allowed or encouraged those acts to continue.

173.   The actions of Defendants resulted from and were taken pursuant to the *de facto* policies and/or well-settled and widespread customs and practices of the State, which are implemented by members of the State. The relevant policies, customs and practices with regard to the unlawful conduct perpetrated against Plaintiff are that powerful figures and supervisors such as Defendant Hoyt are permitted to sexually harass, sexually assault, unlawfully retaliate and create a hostile work environment against Plaintiff Cater

174.   The actions of The Empire State Development Corporation and employees of it's Office and/or other arms of the State of New York (serving local municipalities), resulted from and were taken pursuant to de facto policies and/or well-settled and widespread customs and practices of the Corporation, which are implemented by the Corporation The relevant policies, customs and practices with regard to the unlawful behavior as perpetrated against the Plaintiff, were used as a means to suppress complaints made on a protected basis. The aforementioned policies, customs and practices were further used as a means to initiate a cover-up in order to protect individual Defendants and/or absolve the State of any liability.

175.   The existence of the foregoing unlawful *de facto* unwritten

policies and/or well-settled and widespread customs and practices

is known to be encouraged, and/or condoned by supervisory and

policy-making officers and officials of the Defendant Governor's

Office and/or The State of of New York by and/or through the

Empire State Development Corporation.

176.   Notwithstanding knowledge of such an unlawful *de facto*

unwritten policy, practice, and/or custom, these supervisory and

policy-making officers and officials have not taken steps to

terminate this policy, practice, and/or custom, and do not properly

train employees and/or it's agents/affiliates with regard to acts of

unlawful discrimination and/or unlawful retaliation, and instead

sanction and ratify this policy, practice, and/or custom through

their active encouragement of, deliberate indifference to, and/or

reckless disregard of the effect of said policies, practices, and/or

customs upon the constitutional rights of Plaintiff and other

persons similarly situated to Plaintiff.

177.   The aforementioned policy, practice, and/or custom of failing to

supervise, train, instruct, and discipline employees, agents and

affiliates is specifically exemplified and evidenced by the

misconduct detailed herein.

178.   Plaintiff's injuries were a direct and proximate result of the

Defendants', wrongful *de facto* policy and/or well-settled and

widespread custom and practice and of the knowing and repeated

failure of to properly supervise and train employees and it's agents

and affiliates with regard to unconstitutional discrimination, sexual

harassment, investigation of protected complaints and retaliatory

conduct.

179.   Defendants knew or should have known that the acts alleged

herein would deprive Plaintiff of her rights in violation of the

Fourteenth Amendment to the United States Constitution.

180.   Defendants are directly liable and responsible for the acts of the

individual Defendants and their employees because they

repeatedly and knowingly failed to properly supervise, train, and

instruct them to require compliance with the constitutions and laws

of the State of New York and the United States.

### SIXTH CAUSE OF ACTION
### VIOLATION OF RIGHTS SECURED BY 42 U.S.C. §1985
### (Against All Defendants)

181.   Plaintiff incorporates all preceding paragraphs of this

Complaint as if fully restated herein.

182.   Section 1985(3) provides, in relevant part, that:

If two or more persons in any State or Territory conspire . . . for the purpose of
depriving, either directly or indirectly, any person or class of persons of the equal
protection of the laws . . . in any case of conspiracy set forth in this section, if one
or more persons engaged therein do, or cause to be done, any act in furtherance of
the object of such conspiracy, whereby another is injured in his person or
property . . . the party so injured or deprived may have an action for the recovery
of damages, occasioned by such injury or deprivation, against any one or more of
the conspirators.

183.   All of the aforementioned Defendants acted either, directly or

indirectly, in unlawfully discriminating and retaliating against

Plaintiff on the basis of gender, sexual harassment and complaints

of misconduct and a severe and pervasive hostile work

environment.

184.   Similarly, all of the aforementioned Defendants acted, either directly or indirectly, to cover-up the unlawful discriminatory and retaliatory actions against Plaintiff.

**SIXTH CAUSE OF ACTION**
**VIOLATION OF RIGHTS SECURED BY 42 U.S.C. §1986**
**(Against All Defendants)**

185.    Plaintiff incorporates all preceding paragraphs of this Complaint as if fully restated herein.

186.   Defendants failed to prevent a conspiracy amongst Defendant Hoyt, Defendant Cuomo, and other employees, agents and/or affiliates of the State of New York which only served to deprive Plaintiff of her rights protected as guaranteed by the United States Constitution.

187.   Specifically, Defendants failed to prevent the execution of systematically discriminatory hostile and retaliatory actions against Plaintiff which Defendant failed to do while acting under the color of state law. Defendants further failed to prevent the systematic and severe acts of the State's agent/employee Defendant Hoyt which allowed Defendant Hoyt to continue to commit unlawful acts against the Plaintiff thereby causing significant injury

188.   As a result, Defendants violated the above statute.

**AS AN SEVENTH CAUSE OF ACTION**
**FOR**
**DISCRIMINATION UNDER STATE LAW**
**(Not Against Individual Defendants)**

189.  Executive Law § 296 provides that "1. It shall be an unlawful

discriminatory practice: "(a) For an employer or licensing agency,

because of an individual's age, race, creed, color, national origin, sexual

orientation, military status, sex, disability, predisposing genetic

characteristics, marital status, or domestic violence victim status, to

refuse to hire or employ or to bar or to discharge from employment such

individual or to discriminate against such individual in compensation or

in terms, conditions or privileges of employment."

190. Defendants engaged in an unlawful discriminatory practice by discriminating against the

Plaintiff as set forth herein.

**191.**  Plaintiff hereby makes a claim against Defendants under all of the applicable paragraphs

of Executive Law Section 296.

### AS A EIGHTH CAUSE OF ACTION
### FOR DISCRIMINATION UNDER
### STATE LAW
### (As Against Individual Defendants)

192. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of

this complaint.

193. New York State Executive Law §296(7) provides that it shall be an unlawful

discriminatory practice:

For any person engaged in any activity to which this section applies to retaliate or

discriminate against any person because [s]he has opposed any practices forbidden

under this article."

194. Defendants engaged in an unlawful discriminatory practice by discharging, retaliating, and otherwise discriminating against the Plaintiff because of Plaintiff s opposition to the unlawful employment practices of Plaintiff s employer.

## AS A NINTH CAUSE OF ACTION FOR
## DISCRIMINATION UNDER STATE
## LAW
## (As Against Individual Defendants)

195. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

196. New York State Executive Law §296(6) provides that it shall be an unlawful discriminatory practice:

"For any person to aid, abet, incite compel or coerce the doing of any acts forbidden under this article, or attempt to do so."

197. Defendants engaged in an unlawful discriminatory practice in violation of New York State Executive Law §296(6) by aiding, abetting, inciting, compelling and coercing the discriminatory conduct.

## AS AN TENTH CAUSE OF ACTION FOR
## ASSAULT & BATTERY
## (AS AGAINST INDIVIDUAL DEFENDANT HOYT)

198. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs of the Complaint as set forth at length herein.

199. Under New York law, assault is the (i) intentional placing (ii) of another person (iii) in reasonable apprehension (iv) of imminent harmful or offensive

contact. *See United Nat. Ins. Co. v. Waterfront N.Y. Realty Corp., 994 F.2d 105, 108 (2d. Cir. 1993).*

200.     Under New York law, as a result of the assault, a Defendant commits a battery when (i) there was bodily contact, (ii) the contact was offensive and (iii) the defendant intended to make the contact.

201.     Under the applicable law a Plaintiff may invoke the doctrines of equitable tolling or equitable estoppel because in the current case, Plaintiff was induced by Defendant Hoyt to refrain from filing a timely action and Defendant Hoyt took affirmative steps to conceal his actions against the Plaintiff and the wrong itself was of such a nature to be self-concealing.

202.     Defendant Hoyt intentionally placed Plaintiff Cater in reasonable apprehension of imminent harmful and offensive physical contact as he in an attempt to make offensive contact on Plaintiff Springs.

203.   Defendant Hoyt did in fact intentionally make offensive contact with Plaintiff Cater after he sexually assaulted Plaintiff Cater by groping and assault the Plaintiff in her genital area.

204.   Defendant Hoyt committed assault and battery and is liable to the Plaintiff for her injuries, for which Plaintiff claims damages in an amount to be determined at trial.


WHEREFORE, Plaintiff demands the following relief jointly and severally against all Defendants:

(a) a declaration that Defendants violated Plaintiff's federal and state civil rights;

(d) compensatory damages for the injuries suffered by Plaintiff by reason of Defendants' unlawful and unjustified conduct, in an amount just and reasonable and in conformity with the evidence at trial in an amount to be determined at trial;

(c) punitive damages against the individual Defendants assessed to deter such intentional and reckless deviations from well-settled constitutional standards, to the extent allowable by law;

(d) damages for emotional distress, lost wages, back pay, front pay, statutory damages, medical expenses, interest;

(d) reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and all other applicable laws; and

(e) such other and further relief as appears just and proper.


Dated: New York, New York
       November 18, 2017

DEREK SMITH LAW GROUP, PLLC


_____/s/_____
Paul Liggieri, Esq.
1 Penn Plaza, Suite 3905
New York, NY 10119
(212) 587-0760
*Attorneys for Plaintiff*