UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------X

LISA MARIE CATER,

                    Plaintiff,                    17 Civ. 9032

        -against-                                 OPINION

THE STATE OF NEW YORK, THE EMPIRE
STATE DEVELOPMENT CORPORATION,
GOVERNOR ANDREW CUOMO
(In His Individual Capacity),
and WILLIAM BALLARD HOYT a/k/a
SAMUEL B. HOYT, III (In His
Individual Capacity),

                    Defendants.

-------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 2/4/19

A P P E A R A N C E S:

        Attorneys for Plaintiff

        DEREK SMITH LAW GROUP, PLLC
        One Penn Plaza, Suite 4905
        New York, NY 10119
        By:  Paul Liggieri, Esq.

        Attorneys for Defendants

        OFFICE OF N.Y.S. ATTORNEY GENERAL
        120 Broadway, 14th Floor
        New York, NY 10271
        By:  John M. Schwartz, Esq.

**Sweet, D.J.**

Defendant William Ballard Hoyt, a/k/a Samuel B. Hoyt, III ("Hoyt" or the "Defendant"), pursuant to Rule 12(b)(6) of the Fed. R. Civ. P. has moved to dismiss the Amended Complaint of plaintiff Lisa Marie Cater ("Cater" or the "Plaintiff"). Based upon the conclusion set forth, the motion of the Defendant is granted and the Amended Complaint is dismissed.

**Prior Proceedings**

The prior proceedings are set forth in this Opinion in this action granting the motion to dismiss by the defendant, the Empire State Development Corporation ("ESD") and the Opinion of June 21, 2018 granting the motion to dismiss by the State of New York (the "State") and Governor Andrew Cuomo (the "Governor").

In support of the instant motion, Defendant Hoyt has submitted affidavit evidence with respect to a settlement agreement between Hoyt and Cater and Cater has submitted an opposing affidavit. Certain of the allegations of the Amended Complaint relate particularly to the instant motion. These additional allegations follow:

In October 2015, Plaintiff emailed ESDC for assistance
with affordable housing and identified herself as someone who
was receiving state assistance and in search of a job. (Am.
Compl. ¶¶ 15, 24, 38.) Hoyt routinely answered inquiries from
individuals seeking assistance from the state, and in that
capacity, in October 2015, Hoyt responded to Plaintiff's email.
(Id. ¶ 39.) Thereafter, Hoyt and Plaintiff exchanged emails
regarding potential housing options and employment opportunities
for Plaintiff. (Id. ¶ 40.) During the course of those
preliminary email exchanges, Hoyt "attempted to flirt with
Plaintiff," and that in November 2015, months before Plaintiff
began working for the State, Hoyt "coerced Plaintiff [] to tell
him where she lived" and "began stalking" her. (Id. ¶¶ 41, 43-
44.) In January 2016, Hoyt "barrage[d] Plaintiff [ ] with
sexually harassing calls, texts and emails," again, well before
she began Plaintiff began working for the State. (Id. ¶ 47.)

In February 2016, a representative from the Department
of Motor Vehicles ("DMV"), who is not alleged to have any
connection to Hoyt, contacted Plaintiff and offered her a
secretarial job in the legal area at the DMV, which Plaintiff
accepted. (Id. ¶ 54.) Hoyt worked at ESDC, not the DMV, (id.
¶ 15). Plaintiff does not allege an act of harassment that took

2

place at work; her allegations regarding Hoyt's purported
harassment consist solely of non-work related conduct,
including:

- Calling and texting Plaintiff at night. (Am. Compl.
  ¶ 60.)
- Visiting Plaintiff at her house. (Id. ¶ 65.)
- "Stalking" Plaintiff by asking her daily about her
  cat. (Id. ¶ 70.)
- Inviting Plaintiff to a fireworks show, which she
  did not attend. (Id. ¶¶ 72, 73.)
- Calling a hospital administrator to ask if Plaintiff
  could be seen right away after being admitted for
  stomach pains. (Id. ¶¶ 72, 74.)
- Offering to help Plaintiff with an online
  fundraising page for the injury she allegedly
  sustained from her cat. (Id. ¶ 96.)

Plaintiff alleges that, during the time she was
employed by DMV and having a consensual relationship with Hoyt,
he made "unwanted sexual passes" at Plaintiff, which she
refused. (Id. ¶¶ 30, 57.) Plaintiff's refusals made Hoyt
"increasingly aggressive" and resulted in him "consistently and
without remorse, engag[ing] the Plaintiff in quid pro quo sexual

3

harassment; [and] threatening the Plaintiff's job and livelihood any chance he had." (Id. ¶ 30.) Cater remained at DMV until July 2016, when her cat attacked her and injured her right hand to such an extent that she was required to go on short-term disability. (Id. ¶¶ 81-82.)

After Plaintiff complained about Hoyt on the Governor's public Facebook page (id. ¶ 80), and threatened Hoyt with legal action, on October 26, 2016, the parties entered into an agreement whereby Hoyt paid Plaintiff $50,000 in exchange for her written waiver of all potential claims against Hoyt (the "Settlement Agreement"). (Declaration of Carrie H. Cohen, dated June 4, 2018 ("Cohen Decl."), ¶ 2, Ex. A.) Pursuant to the Settlement Agreement, Plaintiff waived "all claims and potential claims of any kind which Claimant may have against Defendant," including claims for "discrimination," "harassment or retaliation," "battery," "assault," and any claim "arising out of any state or federal discrimination law, including but not limited to Title VII of the Civil Rights Act of 1964 or the New York State Human Rights Law." (Cohen Decl. ¶ 2, Ex. A ¶¶ 3, 5.) The Settlement Agreement also attached as an exhibit and incorporated a general release previously signed by Plaintiff on October 11, 2016, whereby she waived "all manner of . . . causes of action" against Hoyt (the "General Release"). In entering

4

into the Settlement Agreement, Plaintiff represented and
acknowledged that:

- She had "carefully read each and every provision" of
  the agreement and "fully underst[ood] all of the
  terms and conditions" and had entered into the
  agreement "voluntarily, of her own free will,
  without any pressure or coercion from . . . [Mr.
  Hoyt]." (Cohen Decl. ¶ 2, Ex. A at ¶ 15, 17.)

- The $50,000 payment was in consideration of
  Plaintiff's release of claims and that the payment
  represented a "compromise between the parties . . .
  arrived at in view of all claims and potential
  claims of any kind which [Plaintiff] may have
  against [Mr. Hoyt] and all defenses and potential
  defenses...." (Id. ¶ 3.)

- The $50,000 Plaintiff received as consideration
  under the Settlement Agreement exceeded any benefit
  to which she would have been entitled had she not
  agreed to release Mr. Hoyt from potential liability.
  (Id. ¶ 18.)

- Plaintiff was providing Mr. Hoyt "a release of all
  claims and a waiver of all rights to make a claim
  against [Mr. Hoyt] for any reason." (Id. 1, ¶¶ 5
  (i)(ii).)

Plaintiff's hiring at the DMV was done through a
process known as "Management Confidential." (Am. Cplt. At ¶ 56.)
In practice, Management Confidential is used as a vehicle to
distribute patronage jobs to friends of the Governor and other
NYS politicians. (Am. Cplt. ¶ 56.) According to Plaintiff, the
Defendant, Regional President of ESD, used his authority at ESD
and his relationship with the Governor in order to leverage a

job for the Plaintiff. For example, despite New York State protocol, Plaintiff never interviewed for her position with the DMV, nor was she required to take a drug test. Plaintiff's Declaration dated February 14, 2018. (Pl. Decl. ¶¶ 1-2.) The Defendant was individually responsible for hiring Plaintiff and, as Regional President of the ESD, maintained the authority to fire and supervise her placement in the patronage position he had personally availed to her. (Am. Cplt. ¶ 61.)

Beginning in or around July of 2016, Plaintiff attempted to contact the Governor in an effort to report the discrimination and sexual harassment she suffered at the hands of the Defendant. (Am. Cplt. ¶ 77.) The Plaintiff conducted research online and sought different avenues by which to contact the Governor. (Pltf. Decl. ¶ 4.) Cater's correspondence to the Governor included but was not limited to correspondence by email, telephone and text message. (Am. Cplt. ¶¶ 77-80, 103-116.) After unsuccessfully trying to contact the Governor himself, she was referred to The NYS Joint Commission on Public Ethics ("JCOPE"). (Am. Cplt. ¶ 123.) Defendant, using his authority as a powerful public figure at ESD, threatened Plaintiff and advised her that JCOPE would never help her because he was "too powerful" and in "direct contact with the Governor." (Am. Cplt. ¶ 127.)

6

Prior to signing any agreement, Plaintiff had reached out to several attorneys in the Buffalo area in an effort to find one who was willing to handle her case against the Defendant, one of whom was Terry Connors ("Connors"), who spoke to her and listened to the details of her allegations of abuse at the hands of Defendant. (Pltf. Decl. ¶ 6.) At the end of the conversation, Connors informed Plaintiff that he already represented Hoyt and could not represent her. Plaintiff then sought legal representation on a contingency basis from Lindy Korn, who sent a demand letter to the Defendant for $350,000. (Pltf. Decl. ¶¶ 9-10.)

Soon after, Defendant appeared at Plaintiff's house in an attempt to mitigate the negative attention he received, and tried to strike a deal. (Pltf. Decl. ¶ 11.) Plaintiff contends she interpreted the attempt as an offer of money for medical bills relating to the damage to her mental health that was allegedly caused by the Defendant. (Pltf. Decl. ¶ 13.) A few days later, Plaintiff received a courier package from Connors that contained the Settlement Agreement. (Pltf. Decl. ¶ 12.)

On or about October 11, 2016, approximately two days after receiving the agreement, Plaintiff went to Connors's law

office where she signed the release and Settlement Agreement. Connors assured Plaintiff that it was a "standard contract" and that he "deals with these kind of things all the time." (Pltf. Decl. ¶ 15.) At the time of signing the document, Defendant was not in the office, and had not yet signed the document. (Pltf. Decl. ¶ 16.) Connors assured Plaintiff that the Defendant "wanted to make sure [Plaintiff] was able to go away and get help." (Pltf. Decl. ¶ 17.)

A few days after signing the release and the Settlement Agreement, Plaintiff received a call from Connors stating that he had lost the signature page for the "Settlement, Waiver and Release Agreement," and requested that Plaintiff return to his office. (Pltf. Decl. ¶ 18.) On or about October 26, 2016, Plaintiff was provided the signature page to sign as the first party to sign. (Pltf. Decl. ¶ 19.) Connors encouraged her to "go and seek help" for her mental, physical and emotional injuries. (Pltf. Decl. ¶ 20.) Plaintiff did not and currently does not understand whether the terms of the agreement that she signed on October 26, 2016 contains the same terms as the agreement she signed on October 11, 2016. (Pltf. Decl. ¶ 21.)

On multiple occasions, Defendant is alleged to have physically sexually assaulted Plaintiff, and verbally sexually

8

assaulted her. (Pltf. Decl. ¶ 23.). Among other incidents,
Defendant unlawfully grabbed Plaintiff by the vagina in a local
Park (Am. Cplt. ¶ 87); forced himself on her in her own home
(Id. ¶¶ 43-46); and sent her nude photos of himself (Id. ¶ 63).
Throughout the harassment, Defendant repeatedly threatened to
take away the job he had provided Plaintiff. (Id. ¶ 66.) As the
sexual harassment grew in severity, Plaintiff suffered a
complete mental breakdown. (Pltf. Decl. ¶ 27.)

Defendant repeatedly threatened Plaintiff by
aggressively telling her that she should "be grateful" for the
job he got her and that "the job could go away at any time."
(Id. ¶ 68.) When Plaintiff escalated her complaints by reaching
out to JCOPE and speaking confidentially to Defendant's
employee, Peter Smith, Defendant proceeded to threaten Plaintiff
by saying that JCOPE would never help her because he was too
powerful. (Id. ¶ 105.)

The Defendant threatened Plaintiff, nothing that the
agreement was the best she could ever hope to get. (Pltf. Decl.
¶ 28.) Plaintiff believed Defendant's threats because of her
perception of his power in upstate New York, and believed that
if she did not sign the release agreement she would not only
never be able to recover medical costs for the damage to her

9

physical, mental and emotional well-being and would be barred from ever acquiring future employment. (Pltf. Decl. ¶ 29.)

At the time of signing the agreement, Plaintiff had little to no funds in her bank account. (Pltf. Decl. ¶ 33.) In the months prior to the agreement, Defendant had been providing Plaintiff with money. (Pltf. Decl. ¶ 35.)

Plaintiff was under the impression that if she did not sign the agreement she would be blacklisted from the region that Hoyt politically controls and believed that if she did not sign the document, she not only would never be able to get her job at the DMV back, and that she would never be able to work in government again.

Defendant moved to dismiss the amended complaint against him on May 29, 2018. The instant motion was heard and marked fully submitted on July 18, 2018.

**The Applicable Standard**

    **Rule 12(b)(6)**

    On a Rule 12(b)(6) motion to dismiss, all factual allegations in the complaint are accepted as true and all inferences are drawn in favor of the pleader. Mills v. Polar Molecular Corp., 12 F.3d 1170, 1174 (2d Cir. 1993). A complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible on its face.*'" Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)) (emphasis added). A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 663 (quoting Twombly, 550 U.S. at 556). In other words, the factual allegations must "possess enough heft to show that the pleader is entitled to relief." Twombly, 550 U.S. at 557 (internal quotation marks omitted).

    While "a plaintiff may plead facts alleged upon information and belief 'where the belief is based on factual information that makes the inference of culpability plausible,'

11

such allegations must be 'accompanied by a statement of the facts upon which the belief is founded.'" Munoz-Nagel v. Guess, Inc., No. 12 Civ. 1312 (ER), 2013 WL 1809772, at *3 (S.D.N.Y. Apr. 30, 2013) (quoting Arista Records, LLC v. Doe 3, 604 F.3d 110, 120 (2d Cir. 2010)); Prince v. Madison Square Garden, 427 F. Supp. 2d 372, 384 (S.D.N.Y. 2006); Williams v. Calderoni, 11 Civ. 3020 (CM), 2012 WL 691832, at *7 (S.D.N.Y. Mar. 1, 2012)). The pleadings, however, "must contain something more than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action." Twombly, 550 U.S. at 555 (citation and internal quotation omitted).

**The Ratified Settlement and Waiver Bar the Amended Complaint**

The Defendant has contended that Plaintiff's claims are barred by a valid waiver and release. This contention is properly before the Court on a Rule 12(b)(6) motion. *See Burke v. Lash Work Env'ts, Inc.*, 408 F. App'x 438, 441 (2d Cir. 2011 (remanding to the district court because "whether the defendants' . . . claims are extinguished by the [waiver] and Release are questions whose resolution is properly addressed by the District Court on a Rule 12(b)(6) motion"). Courts in this circuit routinely grant motions to dismiss claims similar to those asserted here. *See, e.g., Lewis v. N.Y.C. Dep't of Educ.*,

12

No. 12 Civ. 675 (NRB), 2013 U.S. Dist. LEXIS 139602, at *12
(S.D.N.Y. Sept. 25, 2013) (granting 12(b)(6) motion to dismiss
based on release); *Smith v. JPMorgan Chase*, No. 15 Civ. 808
(PAE), 2016 U.S. Dist. LEXIS 130673, at *26 (S.D.N.Y. Sept. 23,
2016) (same); *Pallonetti v. Liberty Mut.*, No. 10 Civ. 4487, 2011
U.S. Dist. LEXIS 14529, at *16, *24, *35 (S.D.N.Y. Feb. 11,
2011) (dismissing complaint where plaintiff ratified a
separation agreement and could not allege fraudulent
inducement).

It is well established that settlement agreement "are
judicially favored and may not lightly be set aside." *United
States v. Twenty MILJAM-350 IED Jammers*, 669 F.3d 78, 88 (2d
Cir. 2011) (citation omitted). "{A} valid release constitutes a
complete bar to an action on a claim which is the subject of the
release." *Morefun Co. v. Mario Badescu Skin Care Inc.*, No. 13
Civ. 9036 (LGS), 2014 WL 2560608, at *4 (S.D.N.Y. June 6, 2014)
(citing *Interpharm v. Wells Fargo Bank, Nat'l Ass'n*, 655 F.3d
136, 142 (2d Cir. 2011)), aff'd, 588 F. App'x 54 (2d Cir. 2014).

These waiver principles apply to discrimination
claims, so long as the waiver was made "knowingly and
voluntarily." See *Hseuh v. Bank of N.Y.*, No. 05 Civ. 5345 (JSR)
(AJP), 2005 U.S. Dist. LEXIS 25791, at *9-10 (S.D.N.Y. Oct. 31,

13

2005) ("An employee may waive his federal claims of
discrimination, whether under the ADA, Title VII, the ADEA or
similar statutes (and related state claims), provided the waiver
is knowing and voluntary.").

It is undisputed that Plaintiff signed the General
Release and corresponding Settlement Agreement in October 2016
in exchange for $50,000. (Am. Compl. ¶¶ 35, 94-97; Cohen Decl.
¶ 2, Ex. A.) By executing those documents, Plaintiff waived "all
claims and potential claims of any kind" against Hoyt, including
claims for "discrimination," "harassment or retaliation,"
"battery," "assault," and any claim "arising out of any state or
federal discrimination law, including but not limited to Title
VII of the Civil Rights Act of 1964 or the New York State Human
Rights Law." (Cohen Decl. ¶ 2, Ex. A at ¶¶ 3, 5.)

Plaintiff alleges in her Complaint that the Settlement
Agreement is voidable on the bases of "duress," "incapacity," or
"involuntariness," (Am. Compl. ¶¶ 35, 97, 98, 99, 100), and she
asserts in her Opposition that "misrepresentation" and "undue
influence" also apply. (See Pl. Opp. Mem. At 11-15, 18-20.). In
order to pursue any of these theories, though, Plaintiff must
have "promptly repudiate[d] the contract." Plaintiff does not
deny that she retained the entire benefit of her bargain

14

($50,000), a decision that amounts to Plaintiff's ratification of the Settlement Agreement.

Whether or not Plaintiff's conclusory claims of "duress," "incapacity," or "involuntariness," are legally sufficient to repudiate her waiver and are factually established, Plaintiff has ratified the Settlement Agreement, rendering it enforceable.

Contracts that are executed under duress, or where a party is incapacitated or acting involuntarily, are, at most, *voidable*, not automatically void. *See United States v. Twenty MILJAM-350IED Jammers*, 669 F.3d 78, 89 (2d Cir. 2011). For a contract to be void, a party must "promptly repudiate the contract" or else "be deemed to have ratified it." *VKK Corp. v. Nat'l Football League*, 244 F.3d 114, 122-23 (2d Cir. 2001); *see also Farrell v. Title Assocs., Inc.*, No. 03 Civ. 4608 (GWG), 2004 U.S. Dist. LEXIS 2508, at *16 (S.D.N.Y. Feb. 19, 2004 (party's failure to promptly repudiate a contract renders the contract ratified). "A settlement agreement is ratified when a party accepts payment thereunder." *Hewett v. Leblang*, No. 12 Civ. 1713 (PKC), 2013 U.S. Dist. LEXIS 93123, at *19 (S.D.N.Y. 1997) (plaintiff "who accepts and neither returns nor offers to return the consideration he or she has received for . . .

15

executing a release" cannot challenge its validity), aff'd in
relevant part, 150 F.3d 206 (2d Cir. 1998).

Plaintiff ratified the Settlement Agreement by
accepting $50,000 in exchange for waiving her potential claims
against Hoyt and agreeing not to disparage him. (Am. Compl.
¶¶ 35, 97.) She then brought this action without first repaying
or offering to repay that consideration. Plaintiff cannot have
it both ways; she cannot "retain the benefit of [her] bargain
while circumventing her own obligations thereunder." *Hewett*,
2012 U.S. Dist. LEXIS 93123, at *19-20; see *Cheung v. N.Y.
Palace Hotel*, No. 03 Civ. 0091 (DLI) (WDW), 2005 U.S. Dist.
LEXIS 34659, at *12 (E.D.N.Y. Sept. 28, 2005) (dismissing
discrimination claims where plaintiff failed to tender back
consideration prior to initiating a lawsuit seeking rescission
of separation agreement); *Reid v. IBM Corp.*, No. 95 Civ. 1755
(MBM), 199 U.S, Dist. LEXIS 8905, at *50 (S.D.N.Y. June 26,
1997) ("failure to tender back the [$28,000] consideration
before suing, amounted to a knowing and voluntary
ratification").

Ratification requires dismissal of the Amended
Complaint. The issue of voidability presents a factual dispute
which cannot be determined in the context of the instant motion.

16

**The § 1983 Claims Are Dismissed (the First, Second and Fourth Causes of Action)**

As Plaintiff concedes, a Section 1983 claim typically requires that the purported harasser "be a supervisor [or] have some position of authority or control over the plaintiff." (Pl. Opp. Mem. at 21 (citing *Emblen v. Port Auth. of N.Y. and N.J.*, No. 00 Civ. 8877 (AGS), 2002 U.S. Dist. LEXIS 5537, at *19-20 (S.D.N.Y. Mar. 28, 2002)).) Plaintiff appears to concede that Hoyt was not her supervisor, (Pl. Opp. Mem. at 21), nor did he work at the DMV at all. Plaintiff instead appears to argue that Hoyt had control over her employment because he was able to recommend her for a job that she received as part of a "patronage" hiring process. (Pl. Opp. Mem. at 7 (citing Am. Compl. ¶ 56).) Even assuming the truth of Plaintiff's allegation that the "Management Confidential" process is a "vehicle to distribute patronage jobs," (Pl. Opp. Mem. at 7), Plaintiff fails to plausibly allege that it is a means by which employment obtained thereunder is controlled.

Even if Plaintiff actually believes that Hoyt somehow had the power to affect her actual employment—and not just the ability to assist her in getting a job—this belief must be reasonable in order to demonstrate that he acted under color of

17

law for purposes of her Section 1983 claim. See *Burlington Indus. v. Ellerth*, 524 U.S. 742, 759 (1998) (in cases where "there is a false impression that the actor was a supervisor, when he in fact was not, the victim's mistaken conclusion must be a reasonable one"). Plaintiff does not allege facts or a reasonable basis for her apparent belief that Hoyt had "absolute power," to "call in [a political] favor" and have Plaintiff supervised and/or fired at any time. (Am. Compl. ¶¶ 26, 37, 61.)

She further declines to address *Lange v. Town of Monroe*, 213 F. Supp. 2d 411, 423 (S.D.N.Y. 2002), where the court rejected a party's similar "unsubstantiated declaration[s]" that "political clout" can transform a person into a supervisor for purposes of a Section 1983 claim. Plaintiff has not plausibly alleged that Hoyt acted under the color of law with respect to his alleged misconduct.

Both a *quid pro quo* harassment claim and a claim for retaliation require a showing that the alleged harasser took some type of employment action against the accuser. See *Ellerth*, 524 U.S. at 753-54; Feingold v. N.Y., 366 F.3d 138, 156 (2d Cir. 2004). Hoyt contends that Plaintiff fails to allege that he or anyone else took any employment-related action whatsoever. (Hoyt Mem. at 19-20.)

18

Plaintiff has not addressed this argument, but instead focuses solely on Hoyt's position that her claims fail because he lacked authority over Plaintiff's employment. (Pl. Opp. Mem. at 21-23.) While Hoyt's lack of authority is fatal to Plaintiff's Section 1983 claims for the reasons discussed above and in Hoyt's Motion to Dismiss (Hoyt Mem. at 16-19; supra at § III(B)), Plaintiff's *quid pro quo* harassment and retaliation claims also fail because no employment-related action occurred. Plaintiff makes no attempt to explain how her claims can proceed in light of this deficiency, but rather makes unconnected claims about Hoyt's alleged non-workplace conduct. (Pl. Opp. Mem. at 16.) Plaintiff's *quid pro quo* harassment and retaliation claims thus fail.

Plaintiff also has ignored Hoyt's substantive arguments regarding Plaintiff's hostile work environment claim. First, Plaintiff has not pointed to any factual link between Plaintiff's workplace at the DMV and Hoyt, who worked at a separate state agency. Second, Plaintiff has not denied that Hoyt engaged solely in non-work related conduct. Third, Plaintiff has not explained how Hoyt's non-work-related conduct created a work environment sufficiently severe or pervasive "to

alter the conditions of [her] employment and create an abusive

working environment." *Feingold*, 366 F.3d at 149-150.


Indeed, that standard is difficult to meet, as

evidenced by the collection of cases cited by Hoyt in his Motion

to Dismiss where courts rejected hostile work environment claims

despite egregious and repeated conduct that occurred exclusively

at work. (Hoyt Mem. at 21 n.18.) Plaintiff makes no attempt to

distinguish those cases and offers no basis for allowing her

hostile work environment claim to proceed.


Plaintiff has also failed to allege any facts to

support the primary element of a conspiracy: an agreement or

"meeting of the minds." Plaintiff's Opposition does not address

this deficiency, but merely reiterates allegations of her

Amended Complaint regarding Hoyt's conduct, none of which

include alleged actions by anyone other than Hoyt. (Pl. Opp.

Mem. at 24.) Plaintiff's conspiracy claim is dismissed, as is

her claim for failing to prevent a conspiracy, which cannot

proceed absent an underlying viable claim for conspiracy.


Plaintiff concedes that she has no claim against Hoyt

for supervisory liability under Section 1983, arguing in her

Opposition that she asserted it only against the Governor and

ESD. (Pl. Opp. Mem. at 24.) Plaintiff also appears to have
abandoned her state law discrimination claims against Hoyt by
failing to address them in her Opposition. *See Simon v. City of
N.Y.*, No. 14 Civ. 8391 (JMF), 2015 U.S. Dist. LEXIS 58465, at
*8-10 (S.D.N.Y. May 4, 2015) (dismissing claims against certain
defendants because "Plaintiffs failed to respond to Defendants'
arguments with respect to those claims, so those claims [we]re
deemed abandoned"); *Martinez v. City of N.Y.*, No. 11 Civ. 7461,
2012 U.S. Dist. LEXIS 173500, at *3 (S.D.N.Y. Dec. 6, 2012) (A
court "may, and generally will, deem a claim abandoned when a
plaintiff fails to respond to a defendant's arguments that the
claim should be dismissed."). Accordingly, these claims are
dismissed.

**Equitable Estoppel Does Not Apply**

Plaintiff concedes that she filed her Complaint after
the statute of limitations for her assault and battery claims
had lapsed. (See Pl. Opp. Mem. at 25.) Plaintiff, however,
contends that the doctrine of equitable estoppel applies. But
the doctrine is inapplicable because Plaintiff fails to allege
that she (1) was "induced by fraud, misrepresentations or
deception to refrain from filing a timely action" or that she
(2) reasonably relied on those misrepresentations. *Zumpano v.*

21

*Quinn*, 6 N.Y.3d 666, 674 (2006) (quoting *Simcuski v Saeli*, 44
N.Y.2d 442 (1978)).

Plaintiff refers to Hoyt's purported "fraud in the
inducement" of the Settlement Agreement as satisfying the
elements of equitable estoppel. Not only is that theory premised
on facts set forth in the Cater Declaration but it has nothing
to do with Hoyt's alleged inducement of Plaintiff to refrain
from filing a timely action (which he did not do). Rather, the
crux of Plaintiff's new "fraudulent inducement" claims is that
Hoyt and his attorney "misrepresent[ed] the ethos of the
[Settlement Agreement]" as well as its terms. (See Pl. Opp. Mem.
At 20.) Plaintiff makes no attempt to explain how Hoyt's
purported misrepresentation of the Settlement Agreement lulled
her into filing a belated lawsuit, and thus she fails to show
that equitable estoppel applies. Plaintiff's tort claims must be
dismissed as untimely.

**Conclusion**

        For the reasons set forth above Defendant's motion to

dismiss the Plaintiff's claims is granted with prejudice because

amending the complaint again would be futile in light of the

enforceable Settlement Agreement that bars Plaintiff's claims.


        It is so ordered.



**New York, NY**
**January** $30$**, 2019**

                                        **ROBERT W. SWEET**
                                           **U.S.D.J.**